## VAN CAMP SEA FOOD CO., Inc., v. UNITED STATES.

### No. 5772.

Circuit Court of Appeals, Third Circuit.

Feb. 11, 1936.

H. D. Montgomery, of Pittsburgh, Pa., and Breed, Abbott & Morgan, of New York City (Wm. L. Hanaway, of New

York City, and H. D. Montgomery, of Pittsburgh, Pa., of counsel), for appellant.

H. Horatio S. Dumbauld, U. S. Atty., and D. Lloyd Claycomb, Asst. U. S. Atty., both of Pittsburgh, Pa.

Before BUFFINGTON, DAVIS, and THOMPSON, Circuit Judges.

BUFFINGTON, Circuit Judge.

■ This case, a libel by the government to forfeit, is one of grave concern, in that it not alone involves the destruction of a very large quantity of food, but, what is of more importance, it involves also the future of the appellant's extensive business and is a condemnation of the fish inspection of the state of California. Where the drastic remedy of forfeiture by the government of the citizen's property was sought, the late Judge McPherson, then District Judge for the Eastern District of Pennsylvania, stated in a charge to a jury: "It is not required that there should be, for example, as in a criminal case, proof beyond reasonable doubt, and that degree of proof is not required in this case, either— proof beyond a reasonable doubt; but a higher degree of proof than a mere preponderance, a mere balance of evidence in favor of the Government, is required. It is necessary, in a case like this, that the Government should establish, by clear and satisfactory evidence, that its case has been made out."

We agree therewith, and make the adherence or departure therefrom the test of error in the present case, the facts of which are as follows:

The government, on July 20, 1933, filed a libel to forfeit 350 cartons of canned sardines, alleging "that said article of food so designated as aforesaid, as analyzed[1] by the Food and Drugs Administration, Department of Agriculture, United States of America, is shown to be adulterated in violation of section 7, Food and Drugs Act, paragraph 6th, Case of Food, in that product consists in part of decomposed animal substance." 21 U.S.C.A. § 8, Food, par. 6. The libel was sworn to at Pittsburgh by an inspector of the Food and Drugs Administration, who based his knowledge "upon documents and reports of chemists representing the Food and Drug Administration, United States Department of Agriculture, Washington, D. C." The libel stated that the sardines were shipped May 14, 1933, by the owners, from California to Pittsburgh, on the Luckenbach Line and connections. Pursuant to the libel, the carload of sardines in question was taken in possession by the government at Pittsburgh on July 20, 1933, and has been held during the two and a half intervening years. The appellant appeared, claimed the shipment, the case was tried by a jury, whose verdict was: "We * * find a verdict in favor of the United States of America. Recommend the mercy of the Court." On refusal of a new trial and entry of judgment, this appeal was taken, and error is assigned in the court's refusal, at the close of the proofs, to dismiss the libel. While this motion was based on special grounds, we have, in pursuance of our rule which provides, "The Court, at its option, however, may notice a plain error not assigned," addressed ourselves to the general question whether, in view of all the evidence, the libel should have been dismissed and whether the court below committed error in instructing the jury that "the fair preponderance of the evidence" and "the fair weight of the evidence" was sufficient to warrant a verdict for the government. In that regard we are of opinion the court erred and that the requirement is as above quoted in Judge McPherson's charge, namely, that, to warrant forfeiture, "a higher degree of proof than a mere preponderance, a mere balance of evidence in favor of the Government, is required. It is necessary, in a case like this, that the Government should establish, by clear and satisfactory evidence, that its case has been made out."

■ But assuming for present purposes the instructions of the court were right and that in a forfeiture case the preponderance, as in a civil case, is all that is required, did the proofs make out such a case that it could be submitted by a jury to find there was a preponderance? The answer to this question requires the critical study of the proofs, which we now try to make.

The claimants in this case are engaged in the catching, curing, canning, and sale of sardines. Its business is carried on at Terminal Island, on the coast of California. It employs six vessels which catch fish in the open waters of the Pacific during the night, bring them in the morning to the shore plant, and on the same day takes place the process of removing the entrails, cutting off the heads and tails, cooking the

---

[1] The proof of the government shows affirmatively that no such analysis was made.

fish in brine and tomato sauce at high temperature, packing and sealing them in oil and such sauce, and subjecting them meanwhile to continuous inspection by the department of fisheries of the state of California. Each individual fish is examined and packed in the final box by a girl, who throws aside any unfit fish. In this way, the fresh fish, which are never subjected to the sun's rays, are caught and packed in sardine boxes within not to exceed twenty-four hours. By a code of marking enforced by the state of California, every box of sardines has embossed on it a seal or stamp which shows the date such box was sealed, so that the time of catch, the ship making it, and the proofs of the inspectors and ship captains, as well as the delivery thereof to the plant and the subsequent treatment and packing of the fish, can be fixed with certainty. Without entering into details, the claimant proved all these facts, dates, operations, etc., with absolute certainty, and there is no proof to the contrary.

The proofs show that no other fish than those caught by claimant's fishing boats were used in the cartons here in question. They also show claimant's boats were cleaned and the bilge water pumped out after each catch.

The proof of all of the captains, except one, is that their fish were caught after midnight and were delivered at the canning factory at from seven to nine hours after being caught. And, in the case of the remaining boat, the catch was made "during the night preceding and the delivery was at 8 A. M." The testimony of these captains is reinforced by the contemporaneous reports made to the California state fishery inspectors. The proof as to the treatment of the fish is as follows:

"The first boat comes to the dock, and they are taken into nets with a ring around them and lifts them out of the hull of that boat, and are poured into a shoot that goes into a cup or bucket with hoist that hoists them up beyond the second story into the boxes. The boxes automatically weigh five hundred pounds, and as soon as five hundred pounds are reached they are tripped. They are flumed into the water trough and flumed into receiving tanks. The tanks are close to our cutting machines, and they are flumed from the receiving tanks into the cutting machines where the heads and tails are cut off. From that they are flumed into a washer and scaler. It is a revolving net screen that has water pumped on all the time, and which screens and takes off the scales. From that they are flumed to the brining tanks. They are tanks we put them in and salt them down for a period of not less than one hour. From the brining tanks they are flumed to the dryers. The dryers are drop dryers, having ten drops. They are elevated to the top, and are in the screens No. 1. The fish put in that first goes through and drops down to No. 2, down to No. 3, down to No. 4, and down to No. 10. That takes an hour, and the temperature there is 110 degrees. From that they are conveyed by pairs to the packing tables, and the girls on each side of the table pack the sardines by hand, and place them on a conveyor. The conveyor takes them to the closing machine, but in transit they go through a machine that puts the tomato sauce, or whatever sauce we are using, in them. After they go to the closing machine they are sealed, and from there they go to a washing machine that washes off the tomato sauce or anything that might be on the cans. After the washing machines they go to the retorts where they are retorted according to the state laws of California Board of Health requirements. After the retorting process is through they go to the packing room ready for packing and shipping."

The further proof is that the brine is made up of two-thirds salt and one-third water; that it is used on but one batch of fish; that its purpose is to clean the fish and draw the blood out of them; and that the process lasts from one to four hours. The drying process takes an hour; the temperature is 100°; and it takes the moisture out of the fish. The fish are cooked ninety minutes at a temperature of 240°.

The chief inspector of the California state fishery department testified as to the character of state inspection and the steps taken by code and changing of inspectors so as to insure proper food product:

"The cannery has to have a license from the Department before it can operate. The product has to meet the requirements of the State law before it can be shipped. It has to be processed—that is, sterilized at a certain prescribed temperature for a certain length of time, and a record or graph kept of that on a recording thermometer, and that is all checked every day. The equipment on the thermometer consists of record thermometer, mercury thermometer, and record gauge, all to

check each other, are checked to see that they remain in proper working order. The inspector who checks the records checks each chart against each batch or each retort load, and places a blue check mark on there. That is further checked against the production record, which shows the history of that batch. I am talking about processing now. Each can must bear an embossed code on the tin that will identify it, and we allocate those codes to the canners. Those codes are checked each day to see that they use the proper code, so if ten years from now any question comes up about a can, we can look back and find the history of that can. As to the fresh product, each boat is inspected when it comes in; the fresh fish is inspected. The method of inspecting that is when the hold is opened the inspector looks down in the hold, and gets a general idea of the appearance of the fish. From experience you can get a fairly good idea. If the fish are old, there will be an offensive odor—that is, if they are too old—and they will be broken; the heads will be red, and they will be like a rag—lost all their rigidity. If it appears necessary from the looks of the fish, the inspector will go down into the hold; if that appears unnecessary, they don't. Then they watch it up in the hoist, and go into the cannery, take the fish out of the flume, look at them, tear them apart, tear off the skin, look for the amount of fat under the skin, because it makes a quite a bit of difference how a fish stands up as to whether there is considerable fat under the skin or whether the fish is skinny; if they are skinny, they will break down during the rough handling they get in the machinery. Then they go along the machines where the sardines are cut, and after the heads are cut and the entrails withdrawn they can get a still better idea of the fish. After they go through the machine they go through a flume, and you can reach down and get a handful of those fish and look at them after they are dissected. That is, you get a cross section of the fish, cut off a couple of inches back of the head, and you can break it open, tear it down the back bone, and look at the flesh, and so on. Then the fish go through a scaler, and if they are soft, the scaler, which is a revolving squirrel cage and made out of rather rough, corrugated iron, will usually tear a soft fish up. The fish go in this revolving scale and constantly fall down, and that rubbing takes the scale off. From there they go to where we in-spect them next on the packing table, and we walk up and down along the packing tables, and occasionally look at fish that are thrown out by the girls, or that go along through the tables and are thrown out. That way we can see the worst fish. Then we can take fish off the belt, being delivered to the tables—they come on a moving belt—and break the fish open there. We look for any softening or other signs of decomposition as we see them. * * *

"Q. Now, Mr. Bowman, the inspector who examined the fish that came into the cannery on this day, is he assigned to this plant every day, or does he go around from one to the other? A. No, sir. It may have been the only day in the week he was there. We particularly move them around from cannery to cannery.

"Q. But they are assigned to a cannery and stay there all day? A. They are assigned either the preceding evening or in the morning."

The particular state inspector who inspected the fish which made up this lot of sardines testified as to his inspection of the cargoes as received from the several vessels, of his inspection during processing, of the reports he made thereon, which were produced and showed that "the fish were all in excellent condition."

In addition to the foregoing disinterested testimony, there is proof of another inspection. The product of these canneries is sold to wholesalers and brokers situate in all parts of the country. To enable these buyers to be assured as to the sardines, they have a local inspection company which inspects the sardines and issues "certificates to buyers and brokers throughout the United States and in some foreign countries." This company is wholly dissociated from the canneries. It inspected the pack every day; took samples for laboratory tests. The head of the company testified he had been employed by the United States Bureau of Chemistry as an expert in fish cases. He inspected this lot of fish, found them satisfactory and so certified that day. An examination of boxes taken from the shipment was made by several witnesses. Four disinterested men who were wholesalers or buyers—in one case for thirty chain stores—testified that the sardines were good, that they tasted all right, had no odor, and were fit for food. The buyer for the chain stores testified:

"Q. Will you please be good enough to tell the jury exactly what you did in the

examination of these sardines, how you went about it, what you found, and what your conclusions are with respect to their fitness for food, and general merchantability? A. Well, the cans were cut. We dumped them into trays; broke the fish apart, felt the skins of them to see whether they were tight, or whether they were loose for firmness of skin; and whether or not there was any slime on them; smelled them for odor; picked the bones out to see how whole the bone would stay; broke the side walls of the fish apart for texture, to see whether they would break flaky. I felt them with my fingers to detect any softness or gumminess along the sides of the fish. I, myself, ate some out of the different cans we opened, to see whether or not I could set any stale, rancid taste out of them, which I could not detect on smelling the can as soon as I opened them. In my opinion the cans that were opened there in my presence were what I would consider a lot of canned California sardines of a little better quality than the average. * * The condition of the sauce and oil was very good, and the fish were perfect. There weren't any broken fish of any kind in any cans I had seen. * * *

"Q. What did you find as a result of that type of examination? Were they firm or were they not? A. Very firm.

"Q. Is that true of all the fish you examined in this particular lot? A. Yes, all that I examined in this lot.

"Q. Did you examine each individual fish in the cans? A. Yes.

"Q. Now, you have stated that you looked for slime. What did you find as a result of that examination? A. I couldn't find any. All the skins were very firm on the fish.

"Q. You testified that the bones were firm. You examined the back bone of the fish. Will you tell us how you did that? A. Well, split the fish down the back, broke it open in two halves, and took the fork and lifted the bone out, indicating that the fish was firm and sound when packed. Had there been any—I would say a fish that had been out of water too long and had a chance to get stagnant, or something like that, they start to decay along the bone very quickly.

"Q. Did you observe any decomposition of that type along these bones? A. No, I did not.

"Q. Was the bone itself firm, and did it hold together? A. Very firm.

"Q. What would you say as to the texture of the fish itself? A. The texture of the fish and meat was very good.

"Q. From your experience, Mr. Renfer, as a buyer of fish of this type, would you say those sardines were fit or unfit for human consumption? A. Well, my opinion would be they would be fit for human consumption.

"Q. Would you say in your opinion they were decomposed? A. No."

Three other witnesses—wholesale buyers of fish—who were present at this examination, testified to the same effect, that the fish were smelled and tasted. In that respect the proof is:

"Q. Will you tell the jury exactly what examination you made of these fish, and what you found with reference to their quality? A. We cut about fifteen to twenty cans of fish. We examined first for odor; the general color of the fish on the outside. We found the bellies a silvery color, which to my mind would indicate the fish was fresh; the skins firm; had nice sauce. We cut down the backs, split the centers, and examined the fish itself. To me it appeared a very good color, firm, and to my mind the fish was as nice a fish as I have ever seen of that type of fish.

"Q. Did you examine the bones, Mr. Mars? A. Yes, we did.

"Q. And how did you find that? A. The bones was firm.

"Q. Did you make an examination of each individual fish in those cans? A. Yes, we did.

"Q. Did you smell of those fish? A. We smelled them.

"Q. What did you detect, if anything, in reference to an odor? A. There was no foreign odor so far as I could detect.

"Q. Did you taste any of those fish? A. Yes, we did.

"Q. Have you done that same thing in the past in connection with samples you have examined? A. Yes, we do. Every time we get a shipment we examine them in the same way.

"Q. Did you observe any unusual flavor or taste to these fish? A. No.

"Q. How did you find the sauce? A. The sauce was a very good color.

"Q. Now, in your opinion, Mr. Mars, would you say that these fish were or were not decomposed? A. I personally couldn't see any decomposition in the fish.

"Q. Would you say these fish were fit for food or unfit for food? A. I would say it was fit for food."

The proofs offered by the government consisted of two officers of the government, one of whom was Dr. Albert C. Hunter, in charge of the Bacteriological Laboratory at Washington, and who made an examination of sardine cans on July 18, 1933, at the laboratory at Washington. The proof is the information was made on his report. As the record shows the libel was filed and the seizure made two days later, the all-important question arises, Were the boxes Dr. Hunter examined in his laboratory on July 18th part of the seizure made two days later, on July 20th? The only proof is the question and answer:

"Q. Now, doctor, did you make an examination of the 120 cans, I believe it was, of the original samples that were taken in this case? A. I did, yes.

"Q. And where did you make that examination? A. That examination was made in my own laboratory in Washington on the 18th of July, 1933."

Manifestly, this proof does not show the cans he examined in Washington on July 18th did not come from the seizure made two days later in Pittsburgh. Assuming they were Van Camp boxes, where they came from, whether they came from the lot seized two days later, is a matter of speculation, not of certainty. The government's proof is that fish decay rapidly when exposed to the air, but there is no proof when these cans were opened by the attendants or how many hours they stood exposed to the midsummer heat of Washington City. He testified the fish so examined were decomposed and described them as "rotten." Asked what his department regarded as decomposed, he said: "A state of decomposition or rottenness where it gets to the point where it would be obnoxious to the person who is asked to eat it." But it will be noticed that, while he applied the terms "rotten" and "decomposed" to these fish and that the obnoxiousness of them was determined by "the person who is asked to eat them," in point of fact he did not subject these fish to smell or taste. His proof was that redness—or, as his associate said, pinkness—of color was "the infallible index of spoilage of fish products." The witness had never been at the Van Camp plant, he had never examined their process, but stood on his visual examination of the fish in his Washington laboratory. In

these respects his testimony was that he suggests—but without proof—that odor from the fish may have been eliminated by the tomato sauce, but admits the fish he termed "rotten" had no odor. His testimony was:

"A. I have never been able to detect any odor in sardines other than the tomato sauce and the sardine oil.

"Q. A sardine without tomato sauce that had decomposed to the degree you claim these sardines had decomposed would have a persistent obnoxious odor? A. I say I don't know. I haven't seen any rotten sardines canned without tomato sauce or something of that kind. There may be something in the cooking process that would volatilize these foul odors. They might get away."

The first examination testified to was made in Washington two days prior to the seizure, but how or when or where the boxes were obtained does not appear, nor is it shown how long the contents were exposed to the atmosphere of the laboratory in midsummer heat of the city of Washington, and, as bearing on this, the testimony hereafter quoted is that a change and turning to red took place when the fish were exposed to the air.

A study of the testimony of these witnesses shows their conclusions are based on the theory that decomposition can be standardized and that the odor of fish, the taste of fish, or the freshness of fish are not elements to be considered in arriving at their theoretical conclusions. That this theory was determinative with them is made clear by their testimony. Asked, "to what extent am I correct in that statement that you have finally succeeded in classifying decomposition in connection with sardines?" the reply was, "To the extent I can tell in a can by examining canned sardines the condition of that fish before it was canned.

"Q. Now, would the history or background of the fish itself have anything to do with it? A. I don't believe so; not as far as decomposition is concerned."

Fitness for food was not their criterion. The witness was asked:

"I am only concerned with the samples you looked at. Is it your opinion or your contention that these sardines you looked at are or were harmful to health, or would be harmful to health if consumed? A. I merely have an opinion they may be.

"Q. You are not sure about that? A. No, sir.

"Q. You are not urging that as a contention in this case, that it is dangerous to the health of the community if they are sold? A. No, sir."

The witness testified he had no fault to find with the sardines being packed in tomato sauce and that the interior of the fish was not contaminated by the sauce and that "we couldn't detect any odor." The witness based the alleged decomposition on the color of the flesh when the fish was broken up, which he described as "more of a bright pink color, which oxidizes gradually as the air strikes it, and turns a little darker—loses its brightness. * * * In this particular fish the color was a bright pink and gradually darkened as it was exposed to the air." The evidence of this witness shows that, in addition to making tests by smell or taste, no chemical tests were made, that there was no attempt to locate bacteria, and that the important test—the indol—was not made. In that respect his evidence was:

"Q. You made no effort in this case, did you, to determine whether there were any bacteria present? A. No.

"Q. Did you make any chemical examination of the product to determine decomposition? A. No, it was entirely a physical examination.

"Q. Well, now, there are certain prescribed chemical determinations that can be used to detect and determine decomposition. Isn't that so? A. Well, there are certain qualifications. In other words, we have one chemical test which, if positive, indicates decomposition, but it may be negative in the case of decomposition.

"Q. What is that? A. That is the indol test.

"Q. Did you make the indol test on these fish? A. No, sir."

Moreover, the witnesses did not wash away the tomato sauce to see whether the redness was due to tomato sauce, whether it came from the air oxidizing the pink color to redness on exposure to air, and really could not say the fish were unfit for food. And the most practical and conclusive proof that could have been adduced, namely, opening cans before the jury and allowing them to try the homely but practical test of smelling and tasting the sardines, was not offered by the government on which the burden of proof rested.

The witness stated he had not been at the claimant's plant for three years, that he was not familiar with the process it now used, and, in answer to the question, "Now, assuming that the entrails of the fish were removed immediately upon arrival at the cannery, would that retard this decomposition? he said, "I don't believe so."

Furthermore, the fact that these fish were fresh when canned was not a factor with this witness. In that regard he said:

"Q. Well, there must be some expanse of time before this very active state of decomposition that you have described appears. Isn't that so? A. Oh, yes.

"Q. And if it appears that these were well protected, put in the can within a few hours after they had been caught, would that make any difference to you in your opinion? A. Only that it would open up a very fertile field of investigation to find out how fish could have gotten in this condition in that short time. I couldn't go back on my regard that they were decomposed.

"Q. You wouldn't do that no matter what the evidence for the claimant showed was the manner of handling these fish? A. I would be open to convincing on that if I could be convinced.

"Q. You probably would change your testimony if something could be shown to you as a scientific man to indicate any great doubt that this decomposition could have taken place in the short time they were out of the water? A. It would have to be very convincing.

"Q. But there might be some testimony that would change your opinion in that case? A. It might be possible."

From the above it will appear that the redness of the fish, or, as the witness explained, "It was more of a bright pink color, which oxidizes gradually as the air strikes it and turns a little darker—loses its brightness," was the determining factor in the mind of the government's two witnesses, and in their opinion these fresh fish were rotten before they were processed, and this was proved by the fact of the pinkish color when the cans were opened. In that regard the first witness testified:

"I would say that they were in a state of decomposition before they were cooked. * * *

"Q. Now, from your observation of those 11 per cent. that you have told us

about were in an advanced stage of decomposition and rotten when you examined them, were they in an advanced stage of decomposition and rotten when they were placed in the can and before they were processed? A. Yes, sir.

"Q. There isn't any question about that in your mind, I take it? A. Not in my mind, no."

Asked if the history or background of the fish had anything to do with decomposition, he said: "I can tell in a can by examining canned sardines the condition of that fish before it was packed." To the question, "Would the history or background of the fish itself have anything to do with it?" his answer was, "I don't believe so; not as far as decomposition is concerned."

The theory of the precooking rottenness of these concededly fresh fish and the standardization of decomposition was met and overcome by the clear weight of the claimant's proofs. The witness Bowman, whose testimony has been referred to above, is the chief fish inspector for the California state department of fisheries, and was for seven years an inspector for the United States Bureau of Chemistry, and he testified that the pinkness was not a precooking condition, but one that results from cooking. In that regard his testimony is:

"Q. Now, in examining canned sardines have you ever noticed any reddening or tinting of the flesh that was described by the Government witnesses? A. Yes, I have seen a pink sardine.

"Q. To what do you attribute that color? A. I always attributed it to the process.

"Q. Please tell us what part of the process you think is responsible for that. A. Before the present raw process which most of the canneries employ now, they did what they called fried them. That consisted of running them through a bath of cottonseed oil in trays, and allowing the trays to sit over night before packing. Those fish were usually quite white, outside of the fact that the oil always became darkened from cooking, breaking down, oxidizing, and the constant addition of oil which cooked out of the fish, so they were darkened somewhat from this oil, but after the raw process went into effect the fish, I noticed, seemed to have a more pink hue. Why I don't know.

"Q. From your examination for the State of California have you observed this pink condition that the Government has described? A. Well, I don't know for sure whether the pink I have observed is the same condition they are describing or not. I have observed pinkness in sardines though.

"Q. In your opinion is that evidence of decomposition? A. We never considered it so.

"Q. In your opinion is it? Can you state with a reasonable degree of certainty whether or not that is decomposition? A. I can state I do not think it is, because I have seen the sardines day after day, month after month, and even year after year delivered from the boat, and knowing in what condition those sardines were—at least, being satisfied in my opinion—and then following them on through the cannery, and cutting the cans afterwards—the next day after the fish were collected—and it is not my experience that I ever found any connection between the pinkness that I observed and the condition of the fish. I don't believe I ever heard of this as a criticism until this year, except Maine sardines. I have heard it said that that condition in Maine sardines indicated spoiling, but this is the first year I ever heard of its being applied to California sardines."

He further testified that the cooking in tomato sauce gave the pinkish character.

Rom, a witness, who was for twenty years a wholesale dealer in fish, testified that the pinkish color came from the tomato sauce, and that the sardines on the top of the can are more likely to get that color than the lower fish which lie in the oil.

Mars, who had similar experience for twenty-five years, testified the pinkish appearance would not evidence decomposition unless the color was greenish and accompanied by odor.

The head of the inspection company above referred to testified: "I have seen lots of reddening salmon along the backbone and paid no attention to it whatever, unless it threw off an odor of decomposition."

The testimony of the chief inspector, already referred to, was that, so far as honeycombing was concerned, the samples from the fish here seized were actually tasted where there was any pitting. In that regard his evidence was:

"Q. Do you know what honeycombing is? A. Yes.

"Q. Did you find any of that condition on these fish? A. No. Any of these pits

we found in the fish we took particular pains to taste that particular fish, to see whether or not it burned the mouth, and I got no burn out of any of them.

"Q. What did you find with reference to the odor of these fish? A. I thought the odor was perfectly normal.

"Q. Did you examine them for color? A. I noted the color, yes.

"Q. What conclusion did you come to with reference to the color of those fish as having any bearing on their quality? A. The color I considered was absolutely all right as far as the quality was concerned."

As we have said, the burden of proving its case by more than a mere preponderance of testimony rested on the government, and this burden, in our opinion, it did not meet; and this not only from a consideration of what was shown by the government's proof, but also by what it might have shown but which it did not. We refer to the failure to open up boxes of these sardines and submit them to the inspection of the jury. The whole situation could have been solved had the cans been submitted to the jury, who could have by the sense of smell and taste, determined whether the sardines were fit for food, and which course would not have left the jury in such a bewildered state of mind as to constrain them to recommend the mercy of the court. The rendering of such a verdict in itself would almost evidence their distrust of their own findings. Holding, as we do, that the trial judge erred in making the preponderance of proof all that was required, and holding further that on the whole testimony the government had not met the burden resting upon it, the judgment below is reversed, and the case remanded, with instructions to dismiss the libel.