**UNITED STATES v. 254 CASES AND 499 CASES, EACH CONTAINING 48 CANS, OF AN ARTICLE LABELED, IN PART, "NET CONTENTS 10 OZ. AVOIR. BABY BRAND TOMATO SAUCE".**

No. H–214.

District Court, E. D. Arkansas, E. D.

Dec. 21, 1945.

Sam Rorex, U. S. Atty., and W. H. Gregory, Asst. U. S. Atty., both of Little Rock, Ark., for libelant.

Buzbee, Harrison & Wright and Edward L. Wright, all of Little Rock, Ark., for claimant.

LEMLEY, District Judge.

This case arises under the Federal Food, Drug, and Cosmetic Act of June 25, 1938, and more particularly under those provisions of the Act prohibiting the introduction, or delivery for introduction, into interstate commerce of any food that is adulterated or misbranded, and for seizure thereof. 21 U.S.C.A. §§ 331, 334, 342 and 343.

The United States filed an information herein for the condemnation of two lots of 254 and 499 cases, respectively, containing 48 ten ounce cans each of a product, labeled, in part, "Baby Brand Tomato Sauce," and seized the same pending this litigation.

It was alleged in the information that the cases in question were in the possession of the Interstate Grocer Company, of Helena, Ark., having been shipped to said company in interstate commerce from Crystal Springs, Miss., by Uddo & Taormina Company, of that point.

The information further alleged that the article was adulterated in violation of Sec. 342(b) (2), Title 21, U.S.C.A., in that an unconcentrated or a slightly concentrated unspiced tomato liquid with added salt had been substituted for tomato sauce, "an article understood to be a spiced comminuted tomato product which is more concentrated than this article."

It was further alleged that the product was misbranded in violation of Sec. 343 (a), Title 21, U.S.C.A., "in that the label statement 'Tomato Sauce' is false and misleading as applied to an unconcentrated or slightly concentrated comminuted tomato liquid with added salt."

The Uddo & Taormina Company intervened and filed an answer herein claiming ownership of the goods, and denying that the seized article was adulterated or misbranded in violation of the statute.

The case was tried to the Court and has been submitted on oral argument and written briefs.

The charge of adulteration was ignored throughout the trial, and was not referred to in oral argument or mentioned in the briefs; so we take it that it has been abandoned.

The Act prohibiting the introduction into interstate commerce of any food which has been misbranded provides, in part, that "a food shall be deemed to be misbranded if its labeling is false or misleading in any particular."

It is the contention of the Government that the seized product is misbranded "To-

mato Sauce" in that it is not tomato sauce, but something entirely different. The Government contends that tomato sauce is a spiced concentrated tomato product, containing at least 8.37% of salt-free tomato solids, whereas the article under consideration is unspiced and contains only 6.5% of salt-free tomato solids. It is conceded that no regulation has been promulgated by the Administrator, establishing and fixing any definition and standard of identity, or quality, for tomato sauce, as authorized by law, but it is contended that tomato sauce is generally understood by the trade and consuming public throughout the country to be a spiced, concentrated tomato product, containing at least 8.37% of salt-free tomato solids, and that the public would be misled and deceived by the brand of "Tomato Sauce" on an unspiced product containing less than that per cent of such solids.

The claimant bases its contention that the goods are not misbranded on the proposition that it was a pioneer in the manufacture of tomato sauce in America, having canned the product under consideration and labeled it as tomato sauce for more than thirty years, during all of which period it was sold and distributed in the trade territory of Louisiana, Mississippi, Arkansas, and Western Tennessee, and there accepted as tomato sauce.

It was stipulated by the parties that the goods moved in interstate commerce as was alleged in the information.

The product under consideration is processed by the claimant, Uddo & Taormina Company, at Crystal Springs, Copiah County, Miss. Copiah County is in an old tomato raising section. The founder of the company, Mr. R. Raspanti, who testified in the case and whose testimony is hereinafter referred to in detail, came to Crystal Springs in 1914 and established a cannery, which has been in operation ever since.

The tomatoes are brought into the plant directly from the fields by truck and wagon, and in field boxes weighing from fifty to seventy pounds. They are unloaded by hand into a chute, and moved by gravity into a washer. In the washer are revolving plates and flowing water. After being washed, the tomatoes are carried by means of an elevator chain up to, and laid upon, a sorting table with a movable top. There the tomatoes are sorted by women standing on both sides of the table. Their duty is to cull out the imperfect tomatoes, and to remove the stems and cores from those that are usable. The tomatoes move from the sorting table to a mill, or crusher, equipped with revolving steel plates by which they are thoroughly crushed. From thence the product is pumped through a pipe into a cooker where it is cooked from twenty-five to forty minutes, dependent upon the water content of the tomatoes, which content varies with the seasons. After cooking, it is pumped through a pipe into a finishing machine, which removes the skins and extracts the seeds, and thence through another pipe to a filler where the cans are filled mechanically. The filled cans are then sealed and moved to a sterilizing vat where they are boiled in water for approximately fifteen minutes, after which they are packed for shipment.

Six cans of the seized article were withdrawn and delivered to a chemist for analysis. The analysis disclosed that the contents of the cans was a tomato product of approximately 6.5% salt-free tomato solids, containing no spice or other condiment. It is conceded by all parties that this analysis is correct.

As stated, it is conceded by the libelant that no regulation had been promulgated establishing any definition and standard of identity or quality for tomato sauce. Regulations of the Administrator defining tomato juice, tomato puree, and tomato paste, however, were introduced in evidence. These were of some value in aiding the Court to reach its conclusion in the case.

It appears from these regulations that tomato juice is an unconcentrated liquid, extracted from mature tomatoes, with or without scalding, in the extraction of which heat may be applied by any method which does not add water thereto. Salt may be added. The regulation prescribes no minimum or maximum percentage of salt-free tomato solids content for tomato juice, but according to the testimony of Mr. John T. Knowles, of Libby, McNeill & Libby, canners of various products, hereinafter referred to, tomato juice should contain a per cent of such solids ranging from a minimum of $4\frac{1}{2}\%$ to a maximum of from $7\frac{1}{2}\%$ to 8%.

Tomato puree, otherwise known as tomato pulp, according to the regulations, is a concentrated tomato product which may be seasoned with salt, but not otherwise,

and which contains not less than 8.37% but less than 25% of salt-free tomato solids.

And tomato paste is defined as a highly concentrated product which may at the option of the processor be seasoned with salt, spices or flavoring, but which contains not less than 25% of salt-free tomato solids.

The libelant, in order to sustain its contention that the product was misbranded, placed nine expert witnesses on the stand, and offered in evidence certain cans of standard brands of tomato sauce, and a number of labels from other cans. Some of the cans were labeled "Tomato Sauce" and some of them "Tomato Sauce Spanish Style." A can of "Baby Brand Tomato Sauce" and certain cans of other brands were opened and exhibited to the Court, by whom they were tested by pouring and tasting.

The expert witnesses were representatives from various occupations and professions having dealings with tomato sauce. We will briefly review their testimony:

Samuel Alfend, a chemist of the Food and Drug Administration with twenty-two years' experience, defined tomato sauce as a spiced, concentrated tomato product with a salt-free tomato solids content of not less than 8.37%. He stated that it is a tomato puree with spices added. He testified that he had analysed approximately ten well-known commercial brands of tomato sauce and found spices in all of them, and that all were materially higher in tomato solids content than the seized product. Eight of these brands are hereinafter referred to more specifically.

Dr. Robert A. Osborne, a chemist in the Food Division, Beverage Section, of the Food and Drug Administration, testified that it was a part of his duty to make investigations of tomato juices, sauces and other products; that he had analyzed "Baby Brand Tomato Sauce" and would class it as a beverage rather than a sauce.

John T. Knowles, a chemist of twenty-two years' experience in charge of the general laboratory of Libby, McNeill & Libby, manufacturers of food products, of Chicago, Ill., testified that a consumer expects a tomato sauce to be a heavy-bodied product with spices, salt, and sometimes sugar, added. He stated that it should have a body of more than 8.37% of salt-free tomato solids. He defined

"Spanish Style Tomato Sauce" as a somewhat hotter sauce than ordinary tomato sauce, and stated that in some of the Spanish Style sauces finger peppers rather than other peppers were used, because of the fact that they were hotter.

Edward Fox, an Ohio manufacturer of tomato products, with twenty-seven years' experience, defined tomato sauce as a tomato puree plus sugar, salt and spices, with a content of not less than 8.37% of salt-free tomato solids.

A. W. Carswell, plant manager of the Loudon Packing Company, Terre Haute, Ind., with twenty-four years' experience in the canning business, gave the same definition of tomato sauce as that given by Mr. Fox.

A. A. Mayhugh, buyer and sales manager for Silbernagel Wholesale Grocer Company, Pine Bluff, Ark., with twenty-seven years' experience in the wholesale grocery business, during all of which time he handled tomato products, defined tomato sauce as a product of at least the consistency of puree (8.37% solids) with spice added.

Mrs. Philip H. Chauvin, a housewife of Little Rock, Ark., for sixteen years in charge of the Little Rock High School cafeteria, and recently director of the feeding units of the Arkansas Ordnance Plant at Jacksonville, Ark., testified that in purchasing tomato sauce she expected a product of reasonably thick consistency, flavored with spices, salt, and probably sugar, so that, for cooking purposes, nothing need be added; and that she did not consider an unspiced tomato product with a consistency considerably less than that of puree, a tomato sauce, and would not buy it as such.

On cross-examination, recipes for tomato sauce taken from the "Good Housekeeping Cook Book," 1942 edition, published by Farrar & Rhinehart, "The Joy of Cooking," published by the Bobbs-Merrill Company, 1936, and "Soups, Sauces & Gravies," published by the J. B. Lippincott Company in 1939, were read to the witness, and she was questioned with respect thereto. These recipes provided for mixtures containing varying amounts of spices, all the way from "a speck" of pepper to a considerable amount of onions, celery, parsley, peppers, and other ingredients; the salt-free tomato solids content of which mixtures, however, appeared to be

much below that of "tomato sauce" as defined by the expert witnesses for the libelant. The witness stated in effect that the sauces referred to in these cook books were distinctly home products, made from ingredients available to the housewife, and were not comparable to the canned tomato sauces sold generally on the market.

Robert A. Dare, a chef with twenty years' experience, who had also acted as buyer for the Service Club at Camp Robinson, Ark., defined tomato sauce as a puree with spices added.

Mrs. James Keatts, a lady in charge of the Tea Room of the Gus Blass Department Store, of Little Rock, Ark., for the past two years, whose qualifications as an expert were admitted by the claimant, testified that in her opinion tomato sauce is thickened tomatoes, seasoned and ready to use. She stated that it should be seasoned with spices and fats, and that her recipe called for onions also. She said that a commercial tomato product containing no spices and below the standard of ordinary tomato puree, would not be called tomato sauce by her.

As stated, a can of "Baby Brand Tomato Sauce" was opened in the presence of the Court, who poured a part of the contents into a glass and tasted it. Cans labeled "Del Monte Brand Spanish Style Tomato Sauce," packed by the California Packing Corporation, San Francisco, Cal., "Sunny South Spanish Style Tomato Sauce," packed by Lee Aiken & Sons, McAllen, Tex., and "Sacramento Tomato Sauce," packed by Bercut Richards Packing Company, of Sacramento, Cal., were likewise opened in the presence of and tasted and examined by the Court. Two of these, namely, the Sacramento and Del Monte brands, were referred to by Mr. Alfend as having been analyzed by him, and according to his testimony the Sacramento contained 9.7% and the Del Monte 10% of salt-free tomato solids. The Court found from his examination that the Baby Brand product was wholesome, unspiced, but considerably less concentrated and thinner than the other three brands just referred to. The latter brands were highly spiced. It will have been noted that the Del Monte and Sunny South brands were labeled "Spanish Style." The Sacramento was not so labeled, but the word "Savory" appears in small letters on the label between the words "Sacramento" and "Tomato Sauce." The Sunny

South label was not introduced in evidence. The Del Monte label has on it also the following words: "Del Monte Tomato Sauce—a unique cooking sauce, blended especially for cooking uses from vine-ripened tomatoes, salt, peppers and spices, according to the original Del Monte recipe." The Sacramento label has upon it the following additional language: "made from whole red ripe tomatoes, with added salt, onions, green peppers, chili pepper, garlic and cayenne."

In addition to the cans above mentioned, one unopened can of "Libby's Tomato Sauce," manufactured by Libby, McNeill & Libby, of San Francisco, Cal., was introduced in evidence. This is labeled: "Ingredients: tomato puree, salt, dextrose and spices."

There were also introduced in evidence labels from cans of:

"Monarch Spanish Style Tomato Sauce," manufactured by Reid, Murdoch & Co., Chicago, Ill., and described as "made from whole ripe tomatoes with salt, pepper and spices";

"All Good Tomato Sauce Spanish Style," described as "blended from vine-ripened tomatoes, salt, pepper and spices," and canned by F. M. Ball & Co., Oakland, Calif.;

"Bestex Brand Tomato Sauce Spanish Style," packed by Harlingen Canning Co., of Harlingen, Tex., and described on the label as "made from whole tomatoes with added pepper, salt, cayenne, paprika, onion and garlic";

"Can-D-Lite Brand Spanish Style Tomato Sauce," packed by Su Mar Foods, Inc., Chicago, Ill., and described as "made from ripe tomatoes, salt and spices";

"Topmost Spanish Style Tomato Sauce," distributed by General Grocer Co., of St. Louis, Mo., and labeled as composed of "tomato puree, salt, green peppers, onions, garlic, spices";

"Lady Luck Spanish Style Tomato Sauce," described on the label as "with salt, pepper and spices," and canned by Oakland Canning Company, Oakland, Cal., for United Food Products Co., San Francisco, Cal.;

"Hunt's Supreme Quality Spanish Style Tomato Sauce," packed by Hunt Brothers Packing Company, San Francisco, Cal., and described as "made from whole ripe

tomatoes, salt, sugar, pepper and spices added"; and

"Hunt's Supreme Quality Fancy Spanish Style Tomato Sauce," packed by the same company and described in like manner.

Mr. Alfend analyzed six of these last mentioned brands and found that they contained the following percentages of salt-free tomato solids:

Monarch ........................ 13.1%
Can-D-Lite ..................... 9.4%
Topmost ........................ 8.8%
Lady Luck ...................... 9.5%
Hunt's Supreme Quality.......... 10.2%
Bestex ......................... 8.4%

No analysis was made of the products labeled "Hunt's Supreme Quality Fancy Spanish Style Tomato Sauce," and All Good Tomato Sauce Spanish Style."

Four witnesses testified on behalf of the claimant.

R. Raspanti, a partner in the firm of Uddo & Taormina Company, claimant herein, testified that he was born in Palermo, Sicily; that he came to this country in 1913, and in 1914 established the canning factory at Crystal Springs, Miss., now owned by the claimant; that he has personally operated the cannery for the past thirteen years; that he thinks he was the first canner of tomato sauce in America; that his father operated a cannery in Palermo, using practically the same process and producing practically the same article as that produced by him, and that as a boy he learned the canning business while working in his father's plant; that his father's product was unspiced just as is his; that throughout the years a part of his pack has had the same consistency as that manufactured by his father, and a part a greater consistency; that he called the product "tomato sauce" when he came from the old country and he continued to do so for two or three years after beginning business, until he saw that "the trade was confused"; some of which would want tomato paste, others tomato puree, and some tomato sauce; so he changed the labels several times, all the while producing the same product but giving it whatsoever name the trade desired. At the same time, however, as we understand his testimony, a part of his output was labeled tomato sauce. He stated that he continued to label some of his cans tomato puree and tomato paste until the

Food and Drug Administration promulgated certain standards for puree and paste, at which time he discontinued the use of those terms, and from thence down to the present has labeled all of his output tomato sauce; that for two seasons he added spices to a part of his pack and labeled it "Tomato Sauce Spanish Style," but he did not find it profitable and discontinued it; that in his opinion the seized product is plain tomato sauce, and that "Tomato Sauce Spanish Style" is tomato sauce with spices added; that 99% of his product is sold in Arkansas, Louisiana, Mississippi, and Western Tennessee; that at different periods he has marketed it in four and one-half, eight and ten-ounce cans; that he estimates he has sold over 100,000,000 cans in these four states since he has been in business; that he has had no complaints, has sold all he could produce, and that the product has been accepted by the trade as tomato sauce.

The witness testified further that he was familiar with cooking, liked to cook and knew a cook's viewpoint with respect to his product; that many cooks preferred Baby Brand to spiced brands, for the reason that spices could be added to suit the taste; that, for instance, some desire a spaghetti sauce without pepper, others with a small amount of salt, and some with more; that his "sauce" forms a foundation upon which any type of sauce can be built.

A. Glorioso, another witness on behalf of the claimant, stated that he owned a cannery at Crystal Springs, Miss., known as the Mississippi Canning Company, and also canneries in several other states, and at one time had owned another plant in Mississippi; that he had been in the canning business since 1915; that he, like Mr. Raspanti, was born in Palermo, Sicily; that for many years he was a competitor of the latter in Crystal Springs, manufacturing at that point an unspiced tomato product, similar to Baby Brand, the production of which has been discontinued; that his product, however, did not contain more than from 5.5% to 6% of salt-free tomato solids; that he sold practically all of this product, which he described as "tomato sauce," in New Orleans, in Mississippi, and in South America, and that his specialty was the South American business; that when he was actively canning this article he sold a yearly average

of from ten to twelve million cans, and never had any complaints; that there was a time when the product was called paste, but it was not a paste; that in Mississippi now no one calls it sauce or puree, but that ninety-nine out of one hundred people call it tomato paste; that the consistency of the product is regulated by heating; that the longer it is on the fire the thicker it becomes; that everyone does not like a thickened tomato product, but some prefer it thin; that the product is, in his opinion, a sauce, and is spiced by the flavor of its tomato content; that as a natural sauce it has an advantage over those spiced with peppers, etc., in that it can be used in preparing soup, whereas garlic, one of the ordinary constituents of the spiced product, is never used in soup, and that it can be used as a dressing for spaghetties and rices by those who prefer the tomato taste to a spiced flavor.

In response to a question as to why many of the canners use "Spanish Style" in describing their tomato sauce, the witness stated that it was because sweet peppers or hot peppers had been added; that the tendency is to add a certain amount of pepper and spice; and that one can easily change a tomato puree to a sauce by adding a slight amount of cayenne pepper, which would make the spiced puree a "Spanish Style" sauce.

Allein Beall, Jr., testified that he had been in the food brokerage business, operating at Helena, Ark., and Clarksdale, Miss., for twenty-five years; that he has sold the Baby Brand line for the last eight or ten years; and handled the shipment seized in this action; that "Baby Brand Tomato Sauce" was branded "Puree" up until five or six years ago, but since then has been branded "Tomato Sauce," and has been so accepted by wholesalers in his area; and that he has had no complaint on account of lack of concentration or spices. He was asked by counsel for claimant to approximate how many cases of the product he had sold since he had been handling it. He stated that as puree and sauce he had probably sold all told 125,000 cases of 48 cans each, and that if it were available he could sell a large amount of the product at this time.

William Roy Glover testified that he was a member of the firm of Glover & Wilson, food brokers, of Little Rock, Ark., and had been in that business eighteen years; that he had handled "Baby Brand Tomato Sauce" for a period of from twelve to fifteen years; that he estimates that his annual sales of the brand would run anywhere from three to six thousand cases; that his trade territory is all of Arkansas except the extreme eastern portion, which is included in the Memphis and Helena areas; that he has never had any complaints from anyone as to the quality, identity or nature of "Baby Brand Tomato Sauce"; that since the seizure in this case he has, at the request of counsel for claimant, made specific inquiry of four retail dealers as to whether the trade accepts this product as tomato sauce, and has been assured by all four of these dealers that such is the case; that, in fact, the dealers wanted to know when they could get more, and one of them said that it had consumer acceptance "just like Arm & Hammer Soda"; that he had also handled a line of spiced tomato sauces, but that the trade accepted Baby Brand ten to one over the other sauces, and that if it were possible to get substantial quantities of it at the present time, he could readily sell it; that the people with whom he has dealt "bought Baby Brand Tomato Sauce for what it is, namely, an unspiced, slightly concentrated tomato sauce." When asked upon cross-examination whether he was sure that this produce had been sold on the market as tomato sauce for the past twelve years, he stated that he knew definitely that it had been on the market for six or seven years in ten-ounce cans similar to those seized; and he stated further that some time back there was a "Baby Brand Tomato Sauce" which had spices in it, and which was sold by the same company in similar cans and labeled "Spanish Style."

In our opinion, the proof on the part of the libelant clearly sustains its contention that the seized article is misbranded. There seems to be no question but that dealers in, and consumers of, tomato products generally throughout the United States consider tomato sauce to be a spiced product containing not less than 8.37% of salt-free tomato solids. This has been established to our satisfaction not only by the testimony of the expert witnesses (ranging all the way from housewives to chemists and manufacturers of tomato products) who testified for the libelant and who uniformly so defined tomato sauce, but also by the cans, and labels from cans, of standard brands of tomato

sauce which have been introduced in evidence.

■ The seized article fails to meet the requirements of tomato sauce in two particulars: it is not spiced, and it contains but 6.5% of salt-free tomato solids.

With respect to its being unspiced, it is significant that of thirteen brands of tomato sauce introduced in evidence herein, only one—the seized product—was unspiced. It is true that A. Glorioso, one of claimant's witnesses, testified that at one time he manufactured a so-called unspiced tomato sauce in Mississippi, but the proof shows that he is no longer doing so.

In our opinion, the seized product is not a sauce at all, as that term is generally used. Sauce has been defined as "a condiment or composition of condiments and appetizing ingredients eaten with food as a relish; esp., a dressing for meat, fish, puddings, etc."; and a condiment as "something used to give a relish to food, and to gratify the taste; usually, a pungent and appetizing substance, as pepper or mustard; seasoning." Webster's New International Dictionary, Second Edition.

Stress has been laid by claimant on the fact that most of the brands offered in evidence were labeled "Spanish Style Tomato Sauce," and an inference is drawn that there are two kinds of tomato sauce, plain or unspiced, and Spanish Style or spiced. It is true that most of the brands were labeled "Spanish Style," but two of the brands containing spices were not so labeled, and it is apparent from the testimony of various expert witnesses in the case that the words "Spanish Style" merely constitute an adjective phrase conveying the idea that the sauce is heavily spiced.

It may be argued that the objection to the goods on account of their not being spiced is a rather technical one, and that since no definite standard of identity or quality has been fixed, they should not be condemned on that account, especially since the label does not represent that the product is spiced, but, on the other hand, that it is "made from whole tomatoes." If this point were conceded, the claimant would not, in our judgment, be materially aided thereby, because it is also confronted with a deficiency in tomato solids content, which deficiency presents a most serious ethical question inasmuch as it reflects the difference in food value of the claimant's product as compared with the product which is generally understood throughout the United States as being tomato sauce.

It was conceded in argument that the Baby Brand article sells for the same price per ounce as the other brands in evidence. Standard brands vary from 8.4% to 13.1% of salt-free tomato solids, whereas Baby Brand contains an average of only 6.5%. According to the evidence, tomato sauce must be at least of the minimum consistency of puree, which is not less than 8.37% of salt-free tomato solids. Baby Brand therefore lacks 1.87% of containing the minimum percentage of tomato solids required for tomato sauce. This is a deficiency of 22.35%—and we are here referring to the minimum solids requirement for tomato sauce. The evidence also shows that Baby Brand contains only tomato solids and the water from the natural tomato. Therefore, the housewife in spending $1 for "Baby Brand Tomato Sauce" would get only 77.65 cents' worth of food, as compared with a full dollar's worth when she invests in genuine tomato sauce of the lowest concentration. And in this connection the proof shows that one of the standard brands of tomato sauce contains over twice the percentage of tomato solids as that found in Baby Brand.

■ It is true that in four states and parts of states, namely, Louisiana, Arkansas, Mississippi, and Western Tennessee, the claimant's product has been accepted by the consuming public as tomato sauce over a long period of time, but during at least the greater part of that same period standard brands of the spiced product have likewise been so accepted; and, after all, what we are concerned with here is, what do housewives, cooks, restaurateurs, and other buyers throughout the United States, understand tomato sauce to be; not what a part of the consuming public in four states only might consider it to be.

It has been argued that in view of the heavy sales of the seized product in the four states mentioned, consumers there will not be misled by the brand "Tomato Sauce," and that the consuming public elsewhere will not be deceived since practically all of claimant's output is sold in these states. The answer to this is that claimant can, if it sees fit, sell its product anywhere in the country, if it is not misbranded, and, moreover, the population of the four states mentioned does not remain static, but is constantly changing, due to

the influx of people from other sections of the country.

Claimant's contention with respect to trade acceptance over a long period of time is weakened somewhat by the fact that up until the time the Administrator fixed the minimum standards for tomato puree and tomato paste, it had sold its product under those names as well as the name of tomato sauce. Conceding such acceptance, however, as stated, we do not feel that consumer acceptance in four states, alone, can establish a criterion for a food product shipped in interstate commerce.

The seized article is more nearly a tomato juice than any other tomato product that has been discussed in this lawsuit. Dr. Osborne classed it as a beverage. He is an expert on beverages, being in charge of the Beverage Section of the Food Division of the Food and Drug Administration. We examined it and tasted it. It is somewhat heavier than the ordinary tomato juice that we use on our tables. It still may be a beverage, however. It is not a puree, due to its low concentration, and it is not a tomato sauce, which, according to the evidence in this case, is a puree with spices added. Not being a tomato sauce, it is misbranded.

The question of strict or liberal construction of the Act was argued at considerable length by counsel for claimant and for the libelant, and it was contended by the former that since this case involved a libel by the Government to forfeit property of one of its citizens, the proof required must be of a degree higher than a mere preponderance, citing Van Camp Sea Food Co., Inc., v. United States, 3 Cir., 82 F.2d 365. The libelant, on the other hand, contended that the rule of strict construction invoked by the claimant should not be applied, since the Federal Food, Drug, and Cosmetic Act was enacted to protect the public, and should therefore be liberally construed, and cited United States v. Research Laboratories, Inc., 9 Cir., 126 F.2d 42, to sustain its position. It is not necessary for us to choose between these conflicting theories, since in our opinion the Government has established its claim of misbranding by clear and satisfactory evidence. The following language, however, used by the Supreme Court in United States v. Ninety-Five Barrels of Vinegar, 265 U.S. 438, 443, 44 S.Ct. 529, 531, 68 L. Ed. 1094, appears significant in this connection: "It is not difficult to choose state-ments, designs, and devices which will not deceive. Those which are ambiguous and liable to mislead should be read favorably to the accomplishment of the purpose of the act. The statute applies to food, and the ingredients and substances contained therein. It was enacted to enable purchasers to buy food for what it really is." (Citing cases.)

■ The seized product should be condemned, but, being a wholesome food, should not be destroyed. The order will be that the cans under seizure be sold by the marshal after being properly labeled. The sale, however, may be avoided if the claimant will pay the costs of this proceeding and give bond conditioned that the article shall not be sold or disposed of contrary to law, as provided in Section 334(d) of the Act.

Findings of fact and conclusions of law made in accordance with this opinion are filed herewith.